```
          IN THE UNITED STATES DISTRICT COURT FOR
         THE DISTRICT OF MARYLAND, NORTHERN DIVISION
```

|                              |   |                          |
|------------------------------|---|--------------------------|
| SYSCOM, INC.,                | * |                          |
|     Plaintiff,               | * |                          |
|         v.                   | * | CIVIL NO.: WDQ-07-2614   |
| ACS STATE & LOCAL SOLUTIONS, | * |                          |
| INC.,                        | * |                          |
|     Defendant.               | * |                          |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Syscom, Inc. ("SYSCOM") sued ACS State & Local Solutions, Inc. ("ACS") for a preliminary injunction to maintain the status quo for arbitration. Also pending is ACS's motion to dismiss. For the following reasons, the motion to dismiss and request for a preliminary injunction will be denied, and judgment will be entered for ACS.

I.   Background

On August 1, 2005, the Maryland Department of Human Resources ("DHR") sought proposals for various computer services. Pl.'s Mot. Prelim. Inj. at 3. On September 16, 2005, ACS and SYSCOM entered a Teaming Agreement (the "Agreement")[1] to submit a proposal to DHR. *Id*. at 3-4. The Agreement provided that ACS

---

[1] The parties did not execute the final version of the Agreement until January 17, 2006. Pl.'s Mot. Prelim. Inj. at 3 n.2.

1

would be the prime contractor and manage the entire project, and SYSCOM would be the subcontractor--responsible for creating cost and technical proposal information for all computer information services.[2]  *Id.* at 4.

On September 26, 2005, ACS submitted its Initial Response to DHR.  *Id.* at 6.  After substantial negotiations, in May 2006, DHR awarded ACS a three-year contract effective July 1, 2006.[3]  *Id.* at 6.  Under the contract, DHR required ACS to designate 35 percent of its subcontract work to Minority Business Enterprises ("MBEs").  Joseph Pascucci, Project Director for ACS, Aff. ¶ 4. ACS asked SYSCOM to relinquish $1 million annually, so ACS could meet its 35 percent MBE goal.  Pl.'s Mot. Prelim. Inj. at 8. After ACS informed DHR of its difficulty in meeting that goal, DHR reduced the MBE requirement to 25 percent.  *Id.*

In late June 2006, Gerard Vandagna, Vice-President of Operations for ACS, informed Theodore Bayer, President/CEO of SYSCOM that ACS needed $13 million of additional MBE work to meet its MBE goal.  Hr'g Tr. 50:1-8.  The parties disagreed about SYSCOM's diminished level of work, and for several months they discussed alternative plans that would allow ACS to meets its MBE

---

[2] The Agreement included a "Statement of Work" which detailed the services that would be provided exclusively by SYSCOM.  Pl.'s Mot. Prelim. Inj. at 4; *see also* Agreement § 5.

[3] The contemplated ten year term of the contract was subsequently reduced by DHR.  Prelim. Inj. Hr'g Tr. 3:14-15.

2

goals and execute a subcontract with SYSCOM.  Pl's Mot. Prelim. Inj. at 11-12; *see also* Hr'g Tr. 35:1-6.  After extensive negotiations, the parties were unable to finalize the terms of the subcontract, and on July 17, 2007, ACS terminated the Agreement with SYSCOM.  Pl.'s Mot. Prelim. Inj. at 13.

On September 26, 2007, SYSCOM filed a Statement of Claims with the American Arbitration Association ("AAA") seeking monetary and injunctive relief.  *Id.* at 4.  AAA notified SYSCOM that because the arbitration Agreement did not provide for use of the "Rules for Emergency Measures"[4], its request for injunctive relief would not be heard by an arbitrator until the proceedings began.  *Id.* at 2.  On September 28, 2007, SYSCOM filed this complaint for declaratory judgment and injunctive relief.  Paper No. 2.

II.  Discussion

    A.   Preliminary Injunction

SYSCOM seeks to enjoin ACS from: (1) requiring SYSCOM to train new employees; (2) requiring SYSCOM to transfer its experience and knowledge to ACS or ACS' subcontractors by allowing them to "shadow" SYSCOM employees; (3) terminating any SYSCOM employees without good cause; and (4) removing SYSCOM from

---

[4] These optional rules provide for emergency relief prior to the constitution of the arbitration panel.  Commercial Arbitration Rules and Mediation, Optional Rules For Emergency Measures of Protection, O-1 (Am. Arbitration Ass'n 2007).

the DHR project before resolution of their pending motion for preliminary injunction.

1. Standard of Review

In determining whether to grant a preliminary injunction, the Court must consider, "in flexible interplay": (1) whether plaintiff will suffer irreparable harm if the injunction is not granted; (2) the injury to defendant if an injunction is granted; (3) plaintiff's likelihood of success on the merits; and (4) the public interest. *See Blackwelder Furniture Co. v. Seiling Mfg. Co.*, 550 F.2d 189, 193-196 (4th Cir. 1977).

In considering those factors, "the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002). The two most important factors are the irreparable injury to plaintiff and the harm to the defendant. *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 859 F. Supp. 945, 949 (D. Md. 1994). "If, after balancing those two factors, the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for

more deliberate investigation.'" *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991) (*quoting Blackwelder*, 550 F.2d at 195) (internal citations omitted)). But if the balance tips away from the plaintiff, a greater likelihood of success on the merits is required. *Caperton*, 926 F.2d at 359.

a.   Irreparable Harm to Plaintiff

Generally, "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (*citing Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)). Thus, if the plaintiff's loss is a matter of mathematical calculation, the plaintiff fails to establish irreparable injury. *Graham v. Triangle Publ'ns, Inc.*, 344 F.2d 775, 776 (3d Cir. 1965). Even when a harm could be remedied by money damages at judgment, "irreparable harm may exist where the moving party's business cannot survive absent a preliminary injunction," *Hughes Network Sys., Inc. v. InterDigital Commc'n Corp.*, 17 F.3d 691, 694 (4th Cir. 1994), or "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill." *Multi-Channel TV Cable Co.*, 22 F.3d at 552.

SYSCOM contends that it will suffer irreparable harm without injunctive relief because ACS will stop SYSCOM from working on

5

the DHR contract and demand that SYSCOM train ACS's new employees. Pl.'s Mot. Prelim. Inj. at 19. SYSCOM argues that this would: (1) cause a "unilateral transfer of SYSCOM's institutional information, knowledge and experience to ACS"; (2) result in the loss of its largest client, which comprises approximately fifty percent of its revenues and one-hundred percent of its net income; (3) force it to terminate 20 employees--one-third of SYSCOM's workforce; (4) cause SYSCOM to lose its competitive advantage in the market; and (5) hinder its ability to compete for future DHR contracts. *Id.* at 19-24. SYSCOM also stresses that between July 1, 2006 and June 30, 2007 it has lost more than $1,417,679.06, and if it is terminated from the DHR project it will lose another $8,124,132.12 in profits. *Id.* at 16.

ACS counters that the only relevant period for assessing harm is the time between SYSCOM's termination from the contract and the beginning of arbitration. Def.'s Resp. Mot. Prelim. Inj. at 12. ACS asserts that this would result in 30 to 60 days of economic harm, which can be remedied by damages. *Id.* ACS argues that SYSCOM's ability to quantify its expected lost profits weighs heavily against a finding of irreparable harm. Hr'g Tr. 59:19-25; 60:1-8. ACS also argues that SYSCOM's potential loss of revenue and employees is not irreparable harm, and its allegations are too "remote [and] speculative" to establish that

6

harm is imminent.  Def.'s Resp. Mot. Prelim. Inj. at 12-13.

SYSCOM has not demonstrated that it will suffer irreparable harm if the Court does not grant a preliminary injunction.  The damages SYSCOM alleges it will suffer are capable of ascertainment and award should it prevail.  In its Statement of Claims for arbitration, SYSCOM detailed its current and future losses if the injunction is not granted.  *See* Statement of Claims ¶ 63.  Although SYSCOM will suffer some economic loss if it cannot perform work for DHR, it has failed to prove that the loss will destroy its business.  SYSCOM has had a business relationship with DHR for over a decade.  Thus, it knew and understood DHR's MBE concerns and assumed the financial risk when it agreed to subcontract the DHR work.  SYSCOM has not demonstrated irreparable injury.

b.  Injury to the Defendant

SYSCOM maintains that requiring ACS to retain SYSCOM for several additional months will cause minimal harm because ACS has retained it for more than a year without complaint from DHR, and it has provided services to DHR for more than ten years.[5]  Pl.'s Mot. Prelim. Inj. at 23.  SYSCOM stresses that ACS recently sent a letter offering to keep SYSCOM employees on the contract until

---

[5] Even though the parties were unable to negotiate a subcontract, SYSCOM has provided computer services since ACS was awarded the prime contract with DHR.  Pl.'s Mot. Prelim. Inj. at 23.

7

early next year. Hr'g Tr. 27:6-13. SYSCOM asserts that such representations contradict ACS's claim of harm if it continues to employ SYSCOM. Hr'g Tr. 27:10-11. SYSCOM also contends that ACS's claim of harm is without merit because it could have requested a waiver or reduction of the MBE goal, rather than a decrease of SYSCOM's work. Hr'g Tr. 75:11-18. SYSCOM asserts that this would have allowed ACS to maintain its agreements and meet its MBE goals. *Id.*

ACS counters that it will be significantly harmed if it is required to maintain SYSCOM's current level of staffing under the DHR contract. To meet its MBE goal of 25 percent, Vandagna testified that ACS must allocate $30 million to MBE subcontractors. Hr'g Tr. 37:13-18; *see also* Prelim. Inj. Hr'g Def.'s Ex. 1. In the first 15 months of the 21-month contract with DHR, ACS has only paid MBEs $5 million.[6] Hr'g Tr. 38:1-7. To meet its MBE goals by the end of the contract, ACS claims that it must immediately reduce SYSCOM's work load. Hr'g Tr. 38:9-15, 49:1-7. If ACS does not comply with its MBE requirements, Vandagna testified that DHR could cancel the contract, impose fines, withhold payments and even suspend ACS's right to participate in future state contracts. Hr'g Tr. 48:17-22; *see also* Pascucci Aff. ¶ 5. Vandagna also explained that if the

---

[6] At the hearing, ACS estimated that by the end of October 2007, ACS will allocate another $18 million which will raise its MBE percentage to 19.5 percent. Hr'g Tr. 38:5-10.

8

preliminary injunction were granted, ACS would be forced to retain staff whose work would not be compensated by DHR.[7] Hr'g Tr. 42:24.

The changed circumstances, i.e., shortened contract term, decreased project budget and increase in MBE goals, prevented ACS from concluding the originally contemplated subcontract with SYSCOM. Requiring ACS to maintain SYSCOM's current level of staffing would cause ACS to violate state regulations and put it in breach of its contract with DHR. This outweighs the harm to SYSCOM.

c. Likelihood of Success on the Merits

SYSCOM contends that it is likely to succeed on the merits because under New York law agreements to agree are enforceable. Pl.'s Reply Mot. Dismiss at 12. Even if the agreement is not enforceable, SYSCOM claims that under New York law, ACS's material changes to the terms of the Teaming Agreement constituted a breach of the duty of good faith. *Liberty Envtl. Sys., Inc. v. County of Westchester*, No. 94CIV.7431, 2000 WL 1752927 (S.D.N.Y. Nov. 29, 2000); *Teachers Ins. and Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987); *CanWest Global Commc'n Corp. v. Mirkaei Tikshoret Ltd.*, 804 N.Y.S.2d 549,

---

[7] Vandagna testified that if it were to retain nine of the SYSCOM employees, it would lose close to $200,000 a month and upwards of $1 million over a three month period. Hr'g Tr. 43:10-22.

(N.Y. Sup. Ct. 2005). SYSCOM argues that after ACS was awarded the subcontract it sought to substantially change material terms of the subcontract from what the parties contemplated before the bidding process began. Hr'g Tr. 9:22-25, 10:1-2. SYSCOM claims that ACS demanded that it agree to arbitrary provisions, such as an at-will employee status and a drastic reduction in the computer services SYSCOM would provide. Hr'g Tr. 10, 13; *see also* Pl.'s Reply Mot. Dismiss at 12. The proposal of those changes, SYSCOM argues, demonstrates ACS's failure to negotiate in good faith. Pl.'s Mot. Prelim. Inj. at 24-25.

In its defense, ACS argues that the Agreement between the parties is nothing more than an agreement to agree because it leaves material terms open, including price. Def.'s Resp. to Mot. Prelim. Inj. at 16. In support of its contention, ACS relies on *Trianco, LLC v. Int'l Bus. Mach. Corp.*, 466 F. Supp. 2d 600 (E.D. Pa. 2006) (interpreting New York law), which held that teaming agreements are unenforceable if material terms such as price are missing. *Id.* at 14-16. ACS maintains that under the Agreement, certain material terms were to be negotiated in the future; therefore, the parties simply had an agreement to negotiate--not an enforceable contract. *Id.* at 17. ACS also contends that it negotiated with SYSCOM in good faith. ACS asserts that it has documentation that the parties engaged in extensive negotiations for over 12 months, and that at least

10

eight different versions of the subcontract were negotiated. Hr'g Tr. 34:22-25; 35:1-6. Thus, ACS maintains that SYSCOM's claim for breach of its duty of good faith is without merit. *Id.* 35:4.

In *Trianco,* the parties entered a teaming agreement in which Trianco, the subcontractor, agreed to assist IBM, the prime contractor, with preparing a bid to the government. 466 F. Supp. 2d at 603. The agreement left price negotiations for the subcontract price to a future date. *Id.* at 602. IBM received the prime contract, and asked Trianco to quote a new price for the subcontracting job. *Id.* at 603. Trianco submitted a new bid, but IBM rejected it for another subcontractor's lower bid. *Id.* Thereafter, Trianco brought suit for breach of contract asking for specific performance based on the price it offered in the pre-bid phase under the teaming agreement. *Id.* The court dismissed Trianco's breach of contract claim because the agreement did not include a definite subcontract price or an objective method to ascertain a price. *Id.* at 606. The court noted that looking at the agreement as a whole, "the award of a subcontract was contingent on further negotiations," and thus the agreement did not support an enforceable subcontract at the price Trianco proposed under the teaming agreement. *Id.* at 606-607.

New York law is settled that a contract must be definite in its material terms to be enforceable. *Spectrum Research Corp. v.*

*Interscience, Inc.*, 242 A.D.2d 810, 811 (N.Y. App. Div. 1997). Accordingly, "a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable," *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109-10 (N.Y. 1981), especially if the price term were missing. *Trianco*, 466 F. Supp. 2d at 14. SYSCOM and ACS's Agreement--similar to the one in *Trianco*--fails to include certain material terms, including a definite price. Section 5 of the Agreement provides that award of a subcontract to SYSCOM will be subject to "the negotiation of price, risk sharing, and other mutually acceptable terms and conditions." This makes clear that the parties' objective intent was to leave negotiation of a subcontract price--among other terms--until *after* ACS received the prime contract from DHR.[8]

SYSCOM has also failed to establish the likelihood of success on its claim that ACS failed to act in good faith during the negotiations. ACS acknowledges that it sought material changes to the final subcontract, but asserts that changes in the scope of services under the DHR contract required it to renegotiate the levels of support needed from SYSCOM. Hr'g Tr. 64:1-10. Nothing in the parties' Agreement suggests that ACS's

---

[8] During the preliminary injunction hearing, the Court asked SYSCOM to identify where in the parties Agreement it was guaranteed a certain price, but SYSCOM could not find any language. *See* Hr'g Tr. 14-16.

12

proposed changes conflict with terms outlined in the Agreement. The evidence establishes merely that the parties attempted to negotiate a subcontract for several months, but were unable to agree on essential terms.

d.   Public Interest

The public interest has been equated with preserving the status quo until the merits can be fully considered by the trial court. *Maryland Undercoating Co., Inc. v. Payne*, 603 F.2d 477, 481 (4th Cir. 1979).  ACS contends that the public interest lies with its compliance with MBE obligations, not with SYSCOM fulfilling its budgetary needs.  Def.'s Resp. to Prelim. Inj. at 17.  In support of this contention, ACS cites the Code of Maryland Regulations, which highlights the State's requirement that each procurement agency structure its procurement to ensure MBEs are awarded 25 percent of state contracts.  *See* COMAR 21.11.03.01 (2007).  SYSCOM counters that it is in the public interest to prevent DHR from losing years of institutional knowledge, which would occur if SYSCOM were terminated from the contract.  Pl.'s Mot. Prelim. Inj. at 29.  SYSCOM also asserts that ACS's action would put SYSCOM out of business and result in many people losing their jobs.  *Id.*

The public interest lies in allowing the parties to arbitrate free from court interference.  *Harris Sys. Int'l, Inc. v. United States*, 5 Cl. Ct. 253, 266 (1984).  Therefore, it is

within the public interest to deny SYSCOM's motion for preliminary injunction.

B.  Motion to Dismiss

Alternatively, ACS seeks to dismiss SYSCOM's complaint because it asserts that the Court lacks jurisdiction. ACS maintains that § 12(a) of the Agreement precludes the parties from seeking injunctive relief in federal court. Section 12(a) provides that "all disputes, controversies, and claims . . . shall be resolved solely and exclusively through a confidential arbitration proceeding." However, Section 12(d) of the Agreement expressly authorizes the parties to seek "provisional or ancillary equitable remedies from a court . . . before, after, or during the pendency of any arbitration." This clause does not conflict with the parties' decision to resolve disputes by arbitration, but rather gives the Court discretion to preserve the status quo during the pendency of the parties' arbitration proceedings. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053 (4th Cir. 1985) (an injunction may be issued "to prevent conduct by the party enjoined from rendering the arbitral process a hollow formality [because] the arbitral award when rendered could not return the parties substantially to the *status quo ante*"). Accordingly, ACS's motion to dismiss must be denied.

14

III. Conclusion

    For the above stated reasons, SYSCOM's motion for preliminary injunction and ACS's motion to dismiss will be denied.  As SYSCOM has failed to show its entitlement to preliminary injunctive relief, judgment will be entered for Defendant.

<u>November 9, 2007</u>                      <u>        /s/         </u>
Date                                     William D. Quarles, Jr.
                                       United States District Judge